**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal Action No.: 15-94 |
| Plaintiff, | |
| v. | **OPINION** |
| JULIUS WILSON, | |
| Defendant. | |

**CECCHI, District Judge.**

**I.     INTRODUCTION**

Defendant Julius Wilson ("Wilson" or "Defendant") has been indicted for illegally possessing a firearm as a convicted felon. Presently before the Court is Defendant's motion to suppress the firearm he is alleged to have possessed. [ECF No. 17.] The Government opposed the motion. The Court has considered the submissions made in support of and in opposition to the instant motion, as well as the evidence offered during the evidentiary hearing held on April 29, 2016. For the reasons set forth below, Defendant's motion to suppress is denied.

**II.    BACKGROUND**

   **A.    Factual Background**

The facts giving rise to Defendant's motion to suppress are as follows. On June 24, 2014, at approximately 8:06 p.m., the Newark Police Department received an emergency 911 call from a female, who described a man travelling on foot with a handgun in his backpack who had just threatened her. [Pretrial Motions of Defendant Julius Wilson, and Motion to Suppress Evidence and Suppress Statement ("Def. Mot."), ECF No. 17, Ex. D.] She characterized the man as her

"baby's father" and identified him by name as Julius Wilson. [Id.] She described Mr. Wilson as a dark skinned man with short hair, light brown eyes, a little beard, and a mustache, who was wearing a black and gray baseball shirt, blue jeans, and a black backpack. [Id.] The caller told the dispatcher Wilson was at 20th Street between Avon Avenue and Hopkins Place in Newark, New Jersey. [Id.] The caller also told the dispatcher Wilson was currently on federal probation. [Id.] The caller identified herself by name as Safiyah McIntosh and provided her phone number. [Id.]

Newark Police Sergeant John Kirk was the first officer to arrive on the scene. [Memorandum of the United States in Opposition to the Defendant's Pretrial Motions ("Govt. Opp."), ECF No. 20 at 2.] Sergeant Kirk was patrolling in a marked patrol vehicle near Defendant's alleged location when the call came in. [Tr.[1] at 18.] The dispatcher provided Sergeant Kirk with Defendant's description and provided real-time updates as to Defendant's location. [Id. at 21-23; Govt. Ex. 202, admitted into evidence on April 29, 2016.] When Sergeant Kirk saw Defendant walking down the street, he pulled up beside Defendant in his patrol car, rolled down his passenger side window, pointed his gun at Defendant, and ordered Defendant to "stop and don't move."[2] [Tr. at 14.] Sergeant Kirk testified that when he did this, Defendant appeared startled, dropped his backpack onto the ground, and fled on foot. [Id. at 14, 25.] Specifically,

---

[1] "Tr." refers to the transcript of the April 29, 2016 evidentiary hearing.

[2] Defendant alleges that Sergeant Kirk yelled "I am going to blow your f_ _ _ ing head off." [Wilson Affidavit ("Wilson Aff."), ECF No. 17-1 ¶ 10.] The only evidence supporting Defendant's version of events is his own affidavit. At the evidentiary hearing as well as in Sergeant Kirk's continuation report, written shortly after the time of the incident, Sergeant Kirk stated that he said "stop and don't move." [Tr. at 14; Govt. Ex. 302, admitted into evidence on April 29, 2016.] Sergeant Kirk was credible and consistent in his testimony, and the Court credits his version of events on this point. See United States v. Bonner, Criminal No. 1:09-CR-0072-02, 2010 WL 1628989, at *5 (M.D. Pa. Apr. 20, 2010).

2

Sergeant Kirk testified that Defendant "grabbed the backpack" and "slammed it on the ground right in front of him," "almost like in a fit of anger," before he fled from Sergeant Kirk in the "reverse[] direction." [Id. at 14, 25-26, 61-62, 79, 98.] Sergeant Kirk also testified when Defendant dropped his backpack to the ground, Sergeant Kirk heard the distinct sound of a heavy metallic object striking concrete. [Id. at 26.] After advising the dispatcher he was in foot pursuit, Sergeant Kirk exited his vehicle, and chased Defendant on foot for a brief period of time, but when it appeared Defendant might be circling back to the backpack, Sergeant Kirk returned to secure the backpack. [Id. at 27-28.] Sergeant Kirk testified when he returned to the backpack, he saw that it was partially opened, and was able to see part of a handgun inside. [Id. at 29.]

Only after Sergeant Kirk observed a handgun inside the backpack did other officers apprehend Defendant nearby. [Govt. Opp. at 2; Govt. Ex. 202.] The handgun was later identified as a 9-millimeter Smith & Wesson Luger semi-automatic pistol, model 439, with a defaced serial number (the "Firearm"), and was loaded with seven rounds of ammunition. [Govt. Opp. at 2-3.]

**B.     Procedural History**

On February 19, 2015, a federal grand jury returned a one-count indictment charging Defendant with knowingly possessing a firearm as a previously convicted felon, in violation of 18 U.S.C. § 922(g)(1). [ECF No. 1.] On April 8, 2015, Defendant was arrested and had his initial appearance before Magistrate Judge Steven C. Mannion. [ECF No. 3.] At that time, Defendant consented to detention with a right to make a bail application at a later time and was ordered to temporary detention.

On April 15, 2015, Defendant was arraigned before this Court and entered a plea of not guilty. [ECF No. 5.] On that same day, Lorraine S. Gauli-Rufo, Esq. filed a notice of attorney appearance for Defendant. [ECF No. 6.] On March 23, 2016, Defendant filed a pretrial motion to

3

suppress the evidence against him. [ECF No. 17.] The Government filed a brief in opposition to Defendant's motion on April 18, 2016. [ECF No. 20.] Defendant filed a reply on April 21, 2016. [ECF No. 22.] The Government filed a sur-reply on April 27, 2016. [ECF No. 24.] The Court held an evidentiary hearing and oral argument on Defendant's motion on April 29, 2016. After the evidentiary hearing, both parties filed supplemental submissions. [ECF Nos. 25-26.]

### III. LEGAL STANDARD

The Fourth Amendment to the U.S. Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To prevail on a motion to suppress, a defendant generally bears the burden of proving the challenged search or seizure was unreasonable under the Fourth Amendment. See Unitred States v. Acosta, 965 F.2d 1248, 1257 n.5 (3d Cir. 1992) ("The proponent of a motion to suppress has the burden of establishing that his Fourth Amendment rights were violated."). However, once the defendant has established a basis for his motion, i.e., that the search or seizure was conducted without a warrant, the burden shifts to the government to show the search or seizure was reasonable. United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995). The Government must demonstrate by a preponderance of the evidence that the challenged evidence is admissible. See United States v. Matlock, 415 U.S. 164, 178 n.14 (1974).

### IV. DISCUSSION

In deciding whether Defendant's Fourth Amendment rights were violated, the Court must consider the following: (1) whether Defendant was unconstitutionally seized during his encounter with Sergeant Kirk; (2) whether Sergeant Kirk conducted an unconstitutional search of Defendant's backpack; and (3) whether Defendant abandoned his backpack prior to the discovery of the Firearm. The Court will address each argument in turn.

4

### A.     No Initial Seizure of Mr. Wilson

Defendant argues he was unconstitutionally seized when Sergeant Kirk pulled up beside him, pointed his gun at him, and ordered him to "stop and don't move." Defendant argues this was a Terry stop not supported by reasonable suspicion. Alternatively, Defendant argues this was a de facto arrest not supported by probable cause.

#### 1.     No Terry stop

Defendant was not subjected to a Terry stop because Defendant was not seized during his encounter with Sergeant Kirk. In assessing the legality of a Terry stop, a court must first pinpoint the moment of the seizure and then determine "whether that seizure was justified by reasonable, articulable facts known to [the officer] as of that time that indicated that [the suspect] was engaged in criminal activity." Johnson v. Campbell, 332 F.3d 199, 205 (3d Cir. 2003). "A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when ultimately unsuccessful,' or (b) submission to 'a show of authority.'" United States v. Brown, 448 F.3d 239, 245 (3d Cir. 2006) (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)). Whether a person has "submitted" to a show of authority depends on both the nature of the show of authority and the suspect's conduct at the time the officer asserted his authority. "When a suspect flees after a show of authority, the moment of submission is often quite clear: It is when the fleeing suspect stops, whether voluntarily or as a result of the application of physical force." United States v. Lowe, 791 F.3d 424, 431 (3d Cir. 2015) (citing Hodari D., 499 U.S. at 628-29).

Defendant was not seized during his encounter with Sergeant Kirk because Sergeant Kirk did not apply physical force to restrain Defendant's movement and Defendant did not submit to Sergeant Kirk's show of authority. Here, when approached by Sergeant Kirk, Defendant

immediately dropped his backpack and started running—as such, Defendant did not submit to Sergeant Kirk's show of authority. Id. at 433 ("The most obvious example [of failure to submit to authority] is when a suspect runs from the police."). Further, there is no allegation Sergeant Kirk applied physical force to restrain Defendant's movement. Thus, Defendant was not seized during his encounter with Sergeant Kirk.

### 2. Reasonable suspicion

Even if the Court were to find this was a Terry stop, it was accompanied by reasonable suspicion. "A well-established exception to the Fourth Amendment's warrant requirement permits an officer to 'conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" United States v. Lewis, 672 F.3d 232, 237 (3d Cir. 2012) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)). Courts assess reasonable suspicion by examining the totality of the circumstances to determine whether officers had a "particularized and objective basis for suspecting the person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). This inquiry "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting Cortez, 449 U.S. at 418).

Sergeant Kirk was aware of a report of a man with a gun in the vicinity who was currently on federal probation. Sergeant Kirk received a detailed description of Defendant's clothing and appearance, as well as almost real-time updates on his exact location. In fact, when asked at the evidentiary hearing, "[h]ow would you categorize the level of detail you're receiving from the dispatcher up to this point?" [Tr. at 23.] Sergeant Kirk responded "[e]xtremely high." [Id.] And when asked "[a]nd in your experience, how often is it the case that you're given this extremely

6

high level of detail when you're pursuing an unknown suspect?" [Id.] Sergeant Kirk responded "[v]ery rarely." [Id.] Under these circumstances, it was reasonable for Sergeant Kirk to conduct a Terry stop of Defendant "to investigate further the possibility of criminal involvement." United States v. Goodrich, 450 F.3d 552, 559 (3d Cir. 2006).

Defendant argues the 911 caller, Safiyah McIntosh, was an unreliable informant and therefore the Terry stop was not supported by reasonable suspicion. [Def. Mot. at 6-7.] Where a Terry stop is based on a tip provided by an "informant," courts must scrutinize the informant's "veracity, reliability, and basis of knowledge" to determine whether the information relied upon by the police was sufficient to establish reasonable suspicion for the stop." United States v. Johnson, 592 F.3d 442, 449 (3d Cir. 2010) (citing United States v. Torres, 534 F.3d 207, 210 (3d Cir. 2008)). In assessing the reliability of an informant's tip, a court should consider various factors, including whether:

> (1) the information was provided to the police in a face-to-face interaction, allowing an officer to assess directly the informant's credibility;
> (2) the informant can be held responsible if her allegations are untrue;
> (3) the information would not be available to the ordinary observer;
> (4) the informant has recently witnessed the criminal activity at issue; and
> (5) the witness's information accurately predicts future activity.

Id. Here, although the information was not provided in a face-to-face interaction, McIntosh provided the police dispatcher with her name and telephone number, enhancing her "credibility and the reliability of her report by allowing the police to hold her responsible if her tip ultimately proved false." Id. (citing Florida v. J.L., 529 U.S. 266, 270 (2000)). McIntosh gave the dispatcher Defendant's full name, a description of his clothing and appearance, and Defendant's exact location. McIntosh also told the dispatcher that Defendant was her "baby's father," that he had just threatened her, that he was walking with a gun in his backpack, and that he was on federal probation. This detailed information, coupled with the officers' independent corroboration of

7

certain aspects of her tip, is sufficiently reliable to provide the police with reasonable suspicion. See Johnson, 592 F.3d at 451.

### 3. No de facto arrest

An investigative stop that goes on for an unreasonable amount of time or is carried out by unreasonably intrusive means may at some point become a de facto arrest for which probable cause is required. See United States v. Sharpe, 470 U.S. 675, 685-87 (1985) (recognizing that prolonged detention may become a de facto arrest where delay is unnecessary to officers' legitimate investigation); Florida v. Royer, 460 U.S. 491, 502-03 (1983) (plurality opinion) (finding that when suspect was brought into a police interrogation room for questioning, he was, "[a]s a practical matter, . . . under arrest"). Defendant was not subjected to a de facto arrest because under the totality of the circumstances, Sergeant Kirk's conduct was reasonable.

Even if the Court were to credit Defendant's version of events and find that Sergeant Kirk said "I am going to blow your f_ _ _ ing head off," [see Defendant's Sur-Reply to Government's Response to Pretrial Motion to Suppress Evidence, ECF No. 22 at 4-5; see also supra footnote 2], Sergeant Kirk's encounter with Defendant would still not rise to the level of a de facto arrest. The law is clear that "[t]here is no per se rule that pointing guns at people . . . constitutes an arrest." Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir. 1995). Rather, officers may take reasonably necessary steps, including drawing their guns, to ensure their personal safety where—as here— they are responding to a dangerous situation, such as a man armed with a handgun in a high-crime area. See United States v. Edwards, 53 F.3d 616, 619 (3d Cir. 1995).

At the evidentiary hearing, Sergeant Kirk testified about the circumstances leading up to his attempted stop of Defendant. [Tr. at 17-18.] He indicated, among other things, that he had a highly specific physical description that matched Defendant along with information that Defendant

8

was armed with a handgun, was on federal probation, and that this situation was occurring in a "high-crime, high-narcotic area." [Id. at 18.] Under these circumstances, Sergeant Kirk's conduct was reasonably necessary to ensure his personal safety. See Edwards, 53 F.3d at 619. As such, Defendant was not subjected to a de facto arrest when Sergeant Kirk approached him with his weapon drawn and shouted at him.

**B.     No Unconstitutional Search of Defendant's Backpack**

Defendant argues that Sergeant Kirk conducted an unconstitutional warrantless search of the backpack and therefore the Firearm must be suppressed. The Government argues that Sergeant Kirk did not conduct any search of Defendant's backpack because the backpack was partially unzipped and Sergeant Kirk could see the Firearm in plain view.

At the evidentiary hearing, the parties examined Sergeant Kirk at length on the issue of whether the backpack was partially unzipped and whether Sergeant Kirk was able to see the Firearm in plain view. Sergeant Kirk testified, "[w]hen I got to the bag, standing over it, looking down into the partially opened part of the bag, I can see part of the weapon protruding into the visible part of the bag that I could see into." [Tr. at 30.] When asked "[i]n order to see that, did you have to move the bag or touch it at all?" [Id.] Sergeant Kirk replied "[n]o, I did not touch the bag." [Id.] Sergeant Kirk's testimony at the evidentiary hearing is consistent with his continuation report, written shortly after the time of the incident, where he wrote "[w]hen I arrived [to where the backpack was] I observed that the top of the backpack was unzipped and the butt of a medium sized silver handgun was visible to me from where I was standing." [Govt. Ex. 302.]

Defendant argues the photographs taken by the Crime Scene Unit, which arrived on the scene after the fact, show that Sergeant Kirk is lying about the backpack being partially unzipped and the Firearm in plain view. Defendant specifically refers to Government Exhibit 406, admitted

9

into evidence on April 29, 2016, and argues this photograph shows the backpack was zipped. Although this photograph is blurry, the photograph along with the testimony adduced at the evidentiary hearing show that the photograph depicts the bottom of the backpack—not the top part, where the zippers are located. Therefore, there is nothing in the photograph showing that the backpack was zipped, as Defendant alleges. In fact, the photograph shows a spot of red coming out of the top of the backpack on the right hand side. At the evidentiary hearing, Sergeant Kirk was shown a red, white, and blue jacket and identified it as "one of the pieces of clothing that was inside the bag." [Tr. at 44; Govt. Ex. 601P, admitted into evidence on April 29, 2016.] When asked about the red spot in the photograph, Sergeant Kirk replied "[t]he red spot indicated here, the only—the only thing that I could venture to speculate was that it's the color of the clothing that was inside the bag." [Id. at 86.] Given the testimony and evidence presented, it is plausible that the red spot was part of the jacket protruding out of the partially unzipped backpack.

Defendant further argues the 47 second delay between Sergeant Kirk telling the dispatcher he has spotted the backpack ("I got the bag here") and advising the dispatcher a weapon was in the bag ("Yes, affirmative, a weapon in the bag") proves that Sergeant Kirk conducted a warrantless search of the backpack. [Govt. Ex. 202.] At the evidentiary hearing, Sergeant Kirk testified the 47 second delay was "probably the time it took me to walk out of the backyard, view the bag that was still there, and then get to the bag." [Tr. at 66.] When asked again, Sergeant Kirk testified the 47 second difference "was me either walking or jogging back to the bag just to safeguard it until Crime Scene got there." [Id. at 91.] Sergeant Kirk testified that during this 47 seconds he was also looking for an address or location to assign to the incident to give the dispatcher. [Id. at 66.] The Court credits Sergeant Kirk's testimony, which is corroborated by the dispatch call, on this point.

Once Sergeant Kirk saw the Firearm in plain view, the police were authorized to seize it. A police officer can seize evidence in plain view without a warrant if three requirements are met: (1) "the officer must not have violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed"; (2) "the incriminating character of the evidence must be immediately apparent"; and (3) "the officer must have a lawful right of access to the object itself." United States v. Menon, 24 F.3d 550, 559 (3d Cir. 1994) (quoting Horton v. California, 496 U.S. 129, 135-41 (1990) ("Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate.")).

First, Sergeant Kirk did not violate the Fourth Amendment in arriving at the backpack. He was lawfully present on a public sidewalk when he observed the Firearm in Defendant's backpack and, as discussed above, the evidence shows that Sergeant Kirk did not touch the backpack until Crime Scene arrived, but rather Sergeant Kirk was able to see the Firearm in plain view because the backpack was partially unzipped. Second, the object observed in plain view—a gun—was highly and immediately incriminating, and therefore justified the seizure of the object. Horton, 496 U.S. at 142; United States v. Jackson, 414 F. Supp. 2d 495, 500-02 (D.N.J. 2006) (plain view exception applied when officer observed what appeared to be the handle of a handgun).[3] And, finally, Sergeant Kirk had a lawful right of access to the backpack, which Defendant discarded on a public street. As such, seizure of the Firearm—which was visible in plain view—was justified.

---

[3] At the evidentiary hearing, Sergeant Kirk testified "the part of the weapon that I saw was the—the handgrip part and part of the—the lower part of the frame, part of the trigger guard, part of the back strap, but that—that part of the weapon that I could see through the opening in the bag." [Tr. at 30.] When asked "what led you to believe that that was, in fact, a firearm or gun?" [Id.] Sergeant Kirk replied "[t]he knowledge I've accumulated. I mean, since I've been an adult, I've owned guns, shot weapons pretty much all of my adult life, so it's pretty easy to recognize this as a weapon." [Id. at 31.]

### C. Abandonment of the Backpack

The Government asserts that even if Sergeant Kirk conducted a search of the backpack, such a search was justified because Defendant had already abandoned the backpack prior to the search. A warrantless search of property is permissible under the Fourth Amendment where the owner has abandoned his reasonable expectation of privacy in that property. United States v. Fulani, 368 F.3d 351, 354 (3d Cir. 2004) (citing Abel v. United States, 362 U.S. 217 (1960)). "[P]roof of intent to abandon must be established by clear and unequivocal evidence," and the court should "look at the totality of the facts and circumstances in making such a determination." United States v. Harrison, 689 F.3d 301, 307 (3d Cir. 2012) (citing Fulani, 368 F.3d at 354). "In most cases, disclaiming ownership or physically relinquishing the property is sufficient to establish abandonment." Id. at 307.

Defendant argues the Government has not met its burden of proving Defendant's intent to abandon by clear and unequivocal evidence. Alternatively, Defendant argues the backpack was not abandoned because any such abandonment was not voluntary. At the evidentiary hearing, Sergeant Kirk testified that Defendant "yanked [the backpack] off his shoulder and slammed it on the ground at his feet" immediately before he fled from Sergeant Kirk in the "reverse[] direction." [Tr. at 14, 25.] Sergeant Kirk provided two physical demonstrations to show the manner in which Defendant threw the backpack to the ground. Based on this testimony and the accompanying demonstrations, along with the fact that Defendant discarded the backpack on a public sidewalk as he attempted to evade capture by the police, the Court finds that Defendant manifested a clear and unequivocal intent to abandon his backpack. As such, Defendant abandoned any reasonable expectation of privacy in the backpack and, thus, a warrantless search would have been justified.

Defendant argues that Sergeant Kirk's testimony regarding chasing Defendant for only a

brief period of time and then circling back to the backpack because he was fearful that Defendant was going to come back and get the backpack contradicts any argument that Defendant had clearly and unequivocally relinquished all interest in the backpack. The abandonment inquiry, however, is an objective one and courts look at the totality of the facts and circumstances in making such a determination. Fulani, 368 F.3d at 352. Viewing the facts in their totality, Defendant's dropping the bag on a public sidewalk coupled with his immediate flight from Sergeant Kirk, show Defendant's clear and unequivocal abandonment of his privacy interest in his backpack.

Defendant also argues that any abandonment of the backpack was not voluntary because it was "forced." However, because Defendant abandoned his backpack prior to being seized, such abandonment was not forced. See United States v. Thompson, Crim. No. 15-222, 2015 WL 5159180, at *6 (E.D. Pa. Sept. 2, 2015) (finding that "when a defendant disperses evidence prior to being physically seized or submitting to an assertion of authority, such action does not constitute a forced abandonment," and "absent any physical contact with the police or evidence that the defendant yielded to a show of authority, a claim for forced abandonment does not require suppression of the evidence the defendant abandoned prior to the seizure" (internal citations and quotations omitted)). In sum, because Defendant abandoned any reasonable expectation of privacy he would have had in the backpack, a warrantless search of the backpack would be justified.

## V.   CONCLUSION

For the foregoing reasons, Defendant's motion to suppress the evidence against him is DENIED. An appropriate order accompanies this Opinion.

DATE: May 19, 2016

**CLAIRE C. CECCHI, U.S.D.J.**